May it please the Court, I'm Karen Landau and I represent Jason Stewart-Hanson. I will be sharing my argument time with Mr. Quinn Denver, who is the attorney for Ernest Killinger, and we will save four minutes for rebuttal. What is your plan in terms of allocation? These plans don't always work out, as you know, Ms. Landau. I know that well, Your Honor. I would say I'll be arguing for about eight minutes and try to leave half the other 16 minutes for Mr. Denver. Okay. Reserving four. Reserving four. That's the master plan. That's the plan. All right. Go ahead. Go ahead. Okay. So the primary issue I'd like to address is the question of necessity. We're dealing with a Federal statute, and necessity is not the equivalent of convenience. It's well established that while law enforcement agents don't have to exhaust every traditional means of investigation, they have to try. And in this case, they didn't try enough. The ---- Did the district court employ the correct standard in determining necessity? Well, there's no ---- I mean, it was pretty important to me that the district court employ the right standard in making this determination because I'm pretty worried about whether it's a discretionary problem because this is abuse. So is the standard the district court used correct? Well, I think I'm not, Your Honor, I'm not quite sure what you mean by standard. Well, a standard that they ---- I mean, what law did he apply? Did he use the right standard in determining necessity? In one respect, I would say he definitely did not in that he determined that the ---- Well ---- Well, let me just address the point. I'll let you go on. I mean, I looked at what standard he applied. You might argue he didn't do it right, but I have still a tough time understanding why he didn't apply the correct standard. Well, I think he understood the law of necessity. I do think in one respect he made a legal error, which is when he talked about the ability of law enforcement agents, the fact that they said, well, we don't have enough money to do more controlled buys. And that's a basis for necessity. It's not. That is not ---- I mean, that nowhere ---- that falls into the convenience category. Now, otherwise, yeah, I mean, the district court ---- and there's another ---- the other part I would add that is possibly a legal error is that the full and fair statement, the complete statement. As I pointed out in the brief, the ---- there were some significant omissions and misstatements. Most particularly, I think that there was a lack of ---- a lack of acknowledgment of, A, the fact that the confidential informant, Charles Oak, first of all, he was an insider. He was a member of Nuestra Familia. Second of all, he was able to buy drugs within days, within a couple of ---- I think it was either a couple of weeks or days of first being contacted by Diaz. He could have bought more, but they didn't have the money to make the 2-pound purchase that they originally planned. Third of all, and this is ---- Ginsburg. The government says, as I understand the government's argument about Oak, the confidential informant, was that although he had been working this angle for quite a while, he wasn't any closer to getting the names of the suppliers. Is that wrong? I think that is wrong. He ---- what they said is, they said, well, he can't because it's not in the ---- it's not going to be in the Diaz's ---- in this case, it was the person he was targeting ---- it was not going to be in Diaz's interest to give him his source of supply. And that's true in every case. And what happens is over time, usually when somebody infiltrates an organization, they gain a greater level of trust and they become more involved. And essentially, the government, they did, I think, two deals over a 2-week period of time, and they gave up. And they said, well, we're not going to pursue this anymore because it's, you know, we don't have the money and we don't want to ---- I mean, honestly, I'm not sure why. You know, in some affidavits, and I've read a lot of these affidavits, as I'm sure you all have, you know, you'll see, my ---- the informant won't do anymore because he's afraid. He's worried he's going to get killed. We didn't have that here. What we had is we had a true insider who's, you know, a high-ranking NF member, and they just said, well, you know, we want the wiretap, essentially. There were other things, too, that I think are misleading in the affidavit, and I'm saying or that the district court aired. For example, they said, well, we can't surveil Diaz's residence. We found his residence, but we can't surveil it because it's in this rural area. And I can see that. That's probably true. But they had other addresses, and they didn't even try to surveil them. And I think the fact that you have, you know, one address that's not surveillable because it's in this isolated area and there's a lot of people, you know, it's just too hard. I get that, but that doesn't mean you don't even try on the others. I think it would be different if, for example, they'd said, well, we tried these three places, and at this place we couldn't do it because it's at the end of a rural cul-de-sac. And at this place, well, there was counter surveillance here. And at this other place, you know, again, counter surveillance. I think that would be different. But it's not enough to just say, well, we can't do the one place, so we're not going to try anymore. The other thing I wanted to point out, and again, this is, you know, my time is limited, so I'm not going to point to everything in the record. But, you know, one of the things that they found out is there was a simultaneous DEA investigation going on into one of the main suppliers whose true name is Fernando Villalpando. He was in Southern California. And there was a DEA investigation, and they didn't pursue that as an end. They didn't, in other words, there was no indication that they tried to coordinate with the DEA on this. And that might have been an entirely independent basis for uncovering the whole scope of the drug trafficking organization. If there's no further questions, I will reserve the rest of our time. Very well, Ms. Lando. Thank you. Good morning, Your Honors. May it please the Court. I'd like to address two issues. The first one I want to address is peculiar just to Mr. Killinger. It's a sentencing issue. His sentencing guidelines were determined to be 360 months to life, and he was sentenced to 440 months. That was based on the court designating him a manager or supervisor of a participant in the drug conspiracy. Without that extra three points, his range would have been 324 to 405 months. Now, we, in our opening brief, raised the question whether that designation was erroneous. The government did not file an appellee brief. We filed a reply brief, making that showing again. The government didn't file any response. I have filed a 28-J letter giving authorities to the court about the consequences of the government's failures in this regard to present any argument. And I think under the Federal Rule of Appellate Procedure 31C, Circuit Rule, U.S. v. Vallejo and U.S. v. Patzer, the consequence of that is they forfeited their right to argue that that was a proper designation. But I leave that to the Court to determine the consequences. So what's the maximum consequence here? Is that a concession of error? Is it waiver? What is it? What do we have here? I think it's a waiver forfeiture, Your Honor. That's the United States v. Vallejo. So the government's failure to argue error was harmless waives that argument. I think that their failure to argue that this was a proper designation waives or forfeits that argument. So if they waive, I mean, I've seen some of our out-of-circuit cases suggesting that that doesn't affect the court's ability to affirm the district court on any basis supported by the record. I didn't see the Vallejo case saying otherwise. And I think the First Circuit said we could sua sponte, reach that. So you're just saying they waived it so we could choose to say the argument is not waived. I think Vallejo actually said that they waived it and therefore it was over. The court did not make any determination on the harmlessness in that. So we would have the option to say that there's no argument as to harmlessness or that the harmlessness argument was waived. Now, what are you saying was the error? Because there were a number of the district court relied on a number of different pieces of evidence for this manager enhancement. And I know you go ahead. I would like to address that. Actually, under Federal Rule 31c, they can't even appear at oral argument without the court's permission. That's just if they don't file a brief. Right. Did you see any case saying that that applies if a claim was not argued? Because when I read those sites, they said no brief. I filed an opening brief. They filed no epilese brief at all. There were two separate briefs, a joint brief for all the defendants. There's a separate supplemental brief. I asked leave the file. They answered one, nothing on the other one. But I would like to go to the facts. I think the problem here is that the district court confused, as I think the problem with this case is, the Nuestra Familia versus the drug conspiracy. These were some of the facts that the court relied on. They said the appellant was the leader of the Oakland Regiment of the Nuestra Familia. That's a Nuestra Familia. That doesn't have anything to do with supervising and managing individuals in the drug conspiracy. The judge said he opened up a cell phone store with NF money. Again, that's not drug conspiracy. That's NF. He also said there were people who worked for him in the store. The store was a store. That happened to be maybe where there was drugs delivered and later were sold somewhere else. But it isn't a drug conspiracy. Then he also talked about Mr. Benavidez, who did, in fact, work in the cell phone store. He supervised it and ran it, but there was no showing he had anything to do with the drug deals that were going out of that store with Mr. Killinger. Then the other finding was Ramirez and Compa came to the store and negotiated NF drug business using the facilities of the store. Now, there's two problems with that. The only time they came to the store was to discuss whether they were going to send money to the NF generals who were in custody. Nothing to do with drugs. In state prison, right? In state prison. They were already sending it, I think, to federal prison and weren't sending it to state prison. Right. And the other thing was that neither Compa or Ramirez were supervised by him. Mr. Compa or Mr. Ramirez was, in fact, a NF regiment commander of his own, and he reported to Compa. So there was no supervision or management by Mr. Killinger of these people in the NF. Well, but if you take everything, I mean, I put the relevant factors together here on this particular matter. Diaz says that Killinger would have drivers take drugs to Oakland on his behalf because he was taking care of that area. This was his responsibility. He was overseeing that part of California. That's Diaz's testimony. I, of course, summarized it rather than writing it all out. And it also says that Killinger oversaw all of the problems there with the northerners and the drugs there. The northerners and the drugs. Yeah. But let me tell you one thing. Then we go on. Diaz says Benavides took over the cell phone store when Killinger moved away. Benavides was involved in the drug trafficking. He never said that he was involved in the drug trafficking. And let me tell you, can I tell you, Your Honor, what the problem with this is, you are raising things out of the record, which I don't have an opportunity to analyze and rebut because there's been nothing raised by the government. I've been denied a reply brief. Your points may be very good. There may be very good points to be made to them. I know you're wrong about Benavides. He ran the cell phone store. There was nothing that said he had anything to do with drug sales. So that one I know is not right. The other two I can't respond to. I mean, I could give you points in the record where I took this stuff. But there were five or six different times where I find in the record quite a bit of evidence that he was, quote, unquote, a manager or supervisor. I understand your argument about the government never said anything. I'm ambushed. Okay. I see. But let me go on to the other argument about the Nuestra Familia. The government determined that they were going to charge this as a drug conspiracy. They were naming the co-conspirators as both members and nonmembers of the Nuestra Familia. In fact, 12 named co-conspirators were nonmembers, including Ms. Landau's client. In fact, that may be more named nonmembers than there were actually named members. But once they had done that, they decided to try it as a RICO case, and they focused all the attention on the Nuestra Familia. I'll give you one example of the big part that was played in this. Let me ask you a question which was a concern to me when I was reading this issue. Are you specifically challenging any specific piece of evidence that was admitted? Or are you just saying, well, I made a pretrial motion to exclude any gang-related evidence, and now I'm fighting it? Because when I read your brief, I wasn't sure. Your Honor, I think that almost all this evidence should have been kept out. Well, all sounds pretty fair, but there was a pretrial motion, and I know about pretrial motions. And you were trying to exclude gang-related evidence. Now, when I looked to what gang-related evidence you want to exclude, I couldn't find the specifics. All I could find was just general, we don't want gang-related evidence in there. So then my next question, which I think you have to some extent agreed to, so under what rule are you challenging the admission of this evidence? Under 403, Your Honor, prejudicial more than probative. So we're weighing, then, the probative evidence of the value to the danger of unfair prejudice. Correct. And what is my standard on that? Abuse of discretion. But let me point out to you how this became an NF case, okay? Your research staff prepared an oral argument calendar, okay? And they summarized the case as we were appealing their drug trafficking convictions arising out of the operations of the Nuestra Familia prison gang. This is not a RICO. It was supposed to be a drug conspiracy, and we had nothing but piles of prejudicial things about the Nuestra Familia. And I — everything about their operations, their constitution, their probationary, their period, their initiations, and some very, very prejudicial things. One of them was that the Nuestra Familia had issued a hit for a guy named Morales for cooperating. Another one was a lot of testimony by Diaz, which he volunteered about September 16th, which is Nuestra Familia Independence Day, when he said that they went to war with a Mexican mafia and killed lots of them in five prisons. But I understand what you're arguing, and you're really saying, well, this is really unfair prejudice. But the district court said, and this is what I've got to weigh it against, the evidence was critical to the understanding of the formation and purpose of the conspiracy. The exclusion of the evidence would have misled the jury by eliminating the important context for which the calls received went into evidence. So the district court had all this stuff, which I appreciate you're a good arguer, and you've been in front of me before, and you're laying it out. But now I'm trying to say, okay, how do they understand the formation and the purpose if they don't have this additional evidence? And it's an abuse of discretion for the old DJ, which I was at one time, having to decide these cases. The problem in this regard, well, first of all, Your Honor, you can certainly say it's abuse of discretion when they're bringing in murders, or they're bringing in testimony that to go up in category from 1 to 2 to 3, you have to have done a blood oath and killed someone, and that my client was a Category 2, which meant he killed someone. The courts allowed defense to raise this in a trial. It wasn't like all or nothing. Why so why wasn't that a, you know, reasonable accommodation to say with respect to specific evidence you can raise this claim? The problem here, Your Honor, is it came up first on a motion by Stuart Hansen asking to keep it out or have a severance, and then the judge did something. In the trial brief, there was a considerable briefing by all four of them saying all of this should have been excluded. As far as I can see, there was never a ruling on that. And then these counsel never objected to it, and they could have no tactical reason to let in NF evidence. There's nothing about it that can help the clients, and particularly when it got overboard, you know, bringing in all this violence and everything like that. Counsel, you're down to about two minutes. You may want to reserve for your side. I would. Thank you. All right. Good morning, Your Honors. My name is Jason Hitt from the U.S. Attorney's Office in Sacramento. I want to start with an apology. I blew it on the Killinger brief. I missed the supplemental opening brief, and I was focused on the joint opening brief, and I missed that there was this supplemental sentencing issue raised. So are we done? I believe under Brooks you're not. Brooks is 772 F3rd 1161, 2014 case, indicating ---- Did you put a 28J letter in on that? I didn't, Your Honor. I was preparing the argument when I saw Mr. Denver's 28J letter, and I needed to prepare and I just found this case. It was just decided late last year. Well, our rules provide that you should notify us if you're going to cite a case that hasn't been identified before. I understand, Your Honor. All right. Go ahead. I made a number of errors in this Killinger matter. What Brooks says is that this Court has discretion to consider harmlessness sua sponte in extraordinary cases where three factors are present. One, the length and complexity of the record, which I think we would concede both sides would agree this was a lengthy and complex record. Whether the harmlessness of error is certain or debatable. And third, the futility and costliness of reversal and further litigation. Do you expect us to make this decision without even giving counsel a chance to respond? I think you can based on the record that is set forth just in the government's brief. He didn't even have a chance to respond. I had some stuff. I went through the record. I was trying to question him. He didn't know what I was going to come up with. He didn't know how to respond in those particular matters. And you're up here saying the government now is suggesting that we ought to just rule and you didn't do anything and you didn't give counsel a chance to respond? If I hadn't laid out in extensive detail Killinger's leadership record in the factual basis of our brief, then I think the Court's point would be exactly correct. But in the government's brief through pages 9 through 13 with cites to the excerpts of record, which is my answering brief, it's my position that is sufficient to answer the Court's question. Does that refer to Killinger? Yes. Yes. The Killinger statement lays out the summary of evidence presented at trial about Killinger and I would submit demonstrates why the Court did not commit clear error in assessing Killinger, a three-level enhancement. And just briefly on harmlessness, I think my math is a little different than Mr. Denver's. I believe it's harmless because if you take away the three levels, if I recall the record correctly and looking at the PSR, he still would score out as a 38, Category 5, with the same range, 360 to life, and a sentence of 440, 440 months in prison fits well within the guideline range, even if you take away the three-level assessment. And second, I would say that Leal-Vega, even if the Court had erred for some reason based on the leadership assessment, stands for the proposition that harmless error applies even where a Court may have gotten the incorrect guideline range, but it overlaps substantially with a correct guideline range and the explanation is sufficient. And so unless there are specific factual questions, I can move on to other questions the Court may have. But again, I take full responsibility for dropping the ball on the Killinger issue. In this case, the District Court got it exactly right in addressing the wiretap issues, the 403 claim, and the buyer-seller instruction. And I'll just briefly touch on what was raised in the opening argument. First, I would say that when Ms. Landau indicates the affidavit did not have sufficient evidence about why necessity was met, it's important to note that the NF relationship of Diaz to Oak really did play into and is explained to the District Court in the affidavit. Specifically, what's laid out from the recorded meetings and articulated directly by the agent is that Oak was expected to answer to Diaz for any drugs that he obtained. That the buys that we did demonstrated Diaz could provide methamphetamine or cocaine all day, sending downstream couriers and never really allowing any penetration into the upper echelon of the drug suppliers. More importantly — Are we on the motion to suppress issue? Yes, Your Honor. More importantly, what happened is Diaz explained to Oak his plan, the organization's plan for Oak, given his stature, was to open up a Stockton regiment and become a distribution outlet for the NF drugs in Stockton. What he had described or quoted was about 30 pounds of methamphetamine on a regular basis that Oak would take possession of and then be expected to distribute. Given those parameters, in addition, Oak's understanding that he could not go around Diaz to contact Amaro or to go after the suppliers without running afoul of the organization, that was the primary thrust which is articulated in why Oak was limited. So I wanted to just briefly address Ms. Lando's claim that essentially we did some buys and gave up. It was very important to understand this wasn't your typical case. There were very specific relationships that informed Oak as to Diaz. In addition, Ms. Lando mentioned on the necessity issue as to the surveillance, I would submit that on pages of excerpts of record, supplemental — I'm sorry, excerpts of record 195, 196, and 197, the agent does go to great pains to explain how counter surveillance had been used in the buys that occurred and why surveillance, physical surveillance, threatened the integrity of the investigation by tipping off the subjects who were very conscious of law enforcement and were very sophisticated in their techniques. It seems to me that the best argument they have is that this is a broad investigation, may be broader than it needs to be, and therefore there's no way we can find necessity in this particular situation. I think the district court properly rejected that claim and did not abuse its discretion. And in this court's case law, it seems very clear that the government is entitled to and, in fact, should be pursuing large conspiracies such as these with sophisticated, multiple tentacles. I cited the case of Chirac, which involved the Mexican mafia, and I think McGuire and some of the other cases that have detailed what the use of wiretaps is appropriate for and the type of conspiracies. In our view, this case fits squarely within what this Court has previously approved. And we didn't try and — we tried to take a specific slice of a very large organization, the Diaz group within the NF, and ended up trying to go up both into the tentacles of the drug supply, but also go sort of sideways into the distribution outlets of its regiments. It seems like counsel said that the district court's first suggestion that the additional control buys would be prohibitively expensive is a bad basis. That, if it stood alone, it perhaps would not be a statutory or case law-recognized  However, that's clipped out of context. What the district court said in its order was that — a number of things aside from that, but specific as to that issue — was that the purchases were going to be very expensive, but I believe he qualifies that sentence. And the district court says, but in any event, they would be futile in trying to get into the supplier. Is there any case law about economic infeasibility and how that relates to a necessity analysis? In my review, I didn't find one, but it is one that we wanted to be very frank and upfront with the court in that when Diaz fronted to Oak, you're going to be looking at 30 pounds a week or 30 pounds a month. There was simply no way we could outbuy Diaz in the capacity. And even if we did, even if we requisitioned thousands and thousands of dollars, the structure of how the drugs were going to be delivered to Oak and the people who would be sending him the drugs and the expectation of the relationships with Oak and Diaz, that wouldn't provide any access to the supplier. It simply wasn't in the cards for Oak to ever be involved. But to answer your court's question, I couldn't find anything specific on the financial aspect, but it was certainly one of the reasons that we were upfront. And I think the district court correctly went through all the various bases. It noted the economic infeasibility, but it was very careful to say it really didn't seem like it was going to get anywhere anyhow and necessity was untouched. And I'm prepared to submit unless the court has specific questions for me. I have no further questions. Thank you, Your Honor. Thank you, counsel. Ms. Landau, your side has a little over two minutes. Your Honor, so I just want to address the point that counsel made about the 30 pounds a week. You know, that may have been said during the meeting, but there's no showing that they were willing to not deal in smaller quantities. And, in fact, you know, drug traffickers, there's a lot, people say a lot of things. He says, oh, I want you to handle 30 pounds a week or 30 pounds a month or whatever it is, and we can't get into that. But, you know, in fact, they sold them smaller quantities. So the idea that this is the goal doesn't mean at all that he's still not an insider and he doesn't have the weight to penetrate into the organization. The next point I want to make is, you know, two weeks after he meets Diaz, he meets Amaro, and he hangs out with Diaz for four hours, and he meets Amaro, and they have this, you know, four-hour recorded meeting. During that meeting, there's discussion, there's this, there's that. Diaz is doing drug deals on the phone, and Oak is listening to all of this. So I think, you know, the government, you know, I just think there's more to it than what the government is representing. The, you know, the counter-surveillance, again, the government did not try. You know, the proof is in the pudding. They followed, from the first deal that they bought, that drugs were purchased, that Oak purchased drugs, they identified the courier and they followed her successfully. So if there was counter-surveillance, it didn't prevent them from following her. They identified the car. They identified her. She drove to two other locations, which ultimately turned out, which were involved in drug trafficking. One was Mora's. One, I believe, was Gaona's, although I could be mistaken on that. So right away, they find, oh, we, you know, we follow her. We've got the car. We've got these two other locations. Do they surveil those other locations? No, they don't. So that's, this all goes to it. And, again, and, Your Honor, I wanted to address your question on breadth. I think the key here is that breadth is a moving target. And, you know, the government can always say, okay, well, we found this and now we need more, so now we need a wiretap. And so it's not really, I don't think it's a fair, I mean, essentially, by using breadth as a basis for, you know, by saying, well, we need more, there's always going to be necessity. And I don't think that's what Congress intended when they enacted the statute. If they had intended that necessity mean no more than we want to go further and it's convenient and it's helpful, well, of course a wiretap is helpful. It's also very intrusive. And I don't think Congress, I mean, Congress put the necessity requirement in there for a reason. It's not for show. So that's what I'd like to address. I do want to, I don't, will you give me a second? Roberts, excuse me. Counsel, the time for your side has expired. Okay. Can I just make one point? On his, on the organizer adjustment, it's procedural error. So even if it's, the guidelines aren't changed, it would have borne on the judge's decision. All right. Thank you, counsel. Counsel, you know the rules of the game. You consumed very articulately good time. We certainly understand your arguments and they are in the brief. Thank you, counsel. Very well. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Ikuta, N.R. Smith